# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **PHILIP S. ROBINS, et al., on behalf**<br>**of themselves and others similarly situated,** ) | **Case No.  1:11 CV 1373** |
| ) | |
| **Plaintiffs,** ) | **Judge Dan Aaron Polster** |
| ) | |
| **vs.** ) | |
| ) | **MEMORANDUM OF OPINION** |
| **GLOBAL FITNESS HOLDINGS, LLC,** ) | **AND ORDER** |
| **d/b/a Urban Active Fitness,** ) | |
| ) | |
| **Defendant.** ) | |

This removed case comes before the Court on Defendant Global Fitness Holdings, LLC's

Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint ("Motion" or "Motion

to Dismiss").  (**Doc #: 12** ("Mot.").)  The Court has reviewed the Motion, the opposition brief

(Doc #: 13), the reply (Doc #: 14), the sur-reply (Doc #: 15), the attachments thereto and the

entire record and is prepared to issue a ruling.

## I.      INTRODUCTION

On April 15, 2011, Plaintiff Philip S. Robins, on behalf of himself and others similarly

situated, filed a complaint asserting a combination of state common-law and statutory claims

against Defendant Global Fitness Holdings, LLC d/b/a Urban Active Fitness ("Global" or

"Urban Active") in the Cuyahoga County Court of Common Pleas.  (Doc #: 1-1 at 1-15.)  Robins

filed an amended complaint on June 24, 2011 adding five additional class representatives (Maria

Christina Bruch, Tanya Baker, Danette Green, Steve Zadiraka, and Carolyn Odelli), state claims

not previously asserted, and two federal claims.  (Id. at 37-88.)  Based on the presence of federal

claims, Global removed the case to federal court and filed a motion to dismiss.  (Doc #: 1 ¶¶ 3-4.)

On September 20, 2011, Plaintiffs filed a Second Amended Complaint (hereafter referred to as "the Complaint").  (Doc #: 11 ("Compl.").)  Plaintiffs generally allege that, contrary to the express terms of Global's Membership Contracts and Personal Training Contracts (collectively, "Contracts"), Global has (1) retained fees paid by members of its health clubs for the period in which they were disabled, deceased, or relocated, (2) collected from Plaintiffs' credit, debit or bank accounts additional fees not part of the agreed-upon monthly fees, and (3) drafted form contracts containing egregious, confusing and misleading cancellation provisions that guarantee members will be charged for one or more months beyond the date they cancel their memberships.  (Id. ¶¶ 1-6.)  Based on these allegations, Plaintiffs assert the following common-law claims against Global: breach of contract (Count One), unjust enrichment (Count Two), and fraud (Count Three).  Plaintiffs have also asserted claims against Global for violation of the following state and federal statutes:  Ohio's Consumer Sales Practices Act (Count Four), Ohio's Prepaid Entertainment Contracts Act, O.R.C. §§ 1345.41 *et seq.* (Count Five), Ohio's Deceptive Trade Practices Act, O.R.C. §§ 4165.01 *et seq.* (Count Six), Kentucky's Consumer Protection Act - Health Spas (Count Seven), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") (Count Eight), Ohio's version of RICO, O.R.C. §§ 2923.31 *et seq.* (Count Nine), and the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* (Count Ten).

On October 5, 2011, Global filed the pending Rule 12(b)(6) Motion to Dismiss, seeking dismissal of all claims.

## II.    BACKGROUND

Plaintiffs are residents of Ohio or Kentucky who entered into the Contracts at Ohio or Kentucky Urban Active fitness facilities.  Plaintiffs Robins, Baker, Green, Zadiraka, and Odelli all executed Membership Contracts with Global.  (Mot., Exs. 1, 2, 3, 4, and 5, respectively.)  The relevant language of the Membership Contracts differ only in their choice of law provision: the Membership Contracts of Plaintiffs Robins, Zadiraka, and Odelli are governed by Ohio law, while the Membership Contracts of Plaintiffs Baker and Green are governed by Kentucky law. (Id.)  Plaintiff Bruch executed a Personal Training Contract with Global that is governed by Ohio law.  (Id., Ex. 6.)  To cover the cost of membership, members must provide a credit, debit, or bank account number that Global charges monthly through an electronic funds transfer ("EFT").

### A.    PLAINTIFFS' ALLEGATIONS

For purposes of the Motion to Dismiss, the Court takes the following factual allegations asserted in the Complaint as true, and construes them in the light most favorable to Plaintiffs. *Michael v. Javitch, Block & Rathbone, LLP*, – F.Supp.2d –, 2011 WL 5554325, at *2 (N.D. Ohio 2011) (citing *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).

#### 1.    Plaintiff Robins

Phillip Robins entered into a monthly Membership Contract with Global on August 13, 2010.  (Mot., Ex. 1.)  Robins agreed to allow Global to deduct from his bank account only monthly membership payments.  (Compl. ¶ 67.)  He claims that he "was not fully advised of the cost of membership including, but not limited to, [the] annual maintenance fee."  (Id. ¶ 68.)  On October 7, 2010, Robins underwent surgery that prevented him from using Global's facilities. (Id. ¶ 69.)  Robins "informed Global of his disability, cancelled his membership and requested a

-3-

pro-rated refund" – which refund Global denied.  (Id. ¶¶ 70-71.)  Robins claims that Global

"continued to charge and collect unauthorized funds" from his bank account after he cancelled

his contract.  (Compl. ¶ 72.)

### 2.      Plaintiffs Zadiraka and Odelli

Steve Zadiraka and Carolyn Odelli signed the form Membership Contracts with Global

on September 26, 2009.  (Mot., Exs. 4-5.)  They agreed to allow Global to deduct from their

credit card bank/debit accounts only monthly membership payments.  (Compl. ¶ 102.2.)  Like

Robins, these Plaintiffs claim that they were "not fully advised of the cost of membership

including, but not limited to, [the] annual maintenance fee."  (Id. ¶ 102.1.)  In mid-November

2010, Zadiraka/Odelli informed Global of their intent to cancel, and Global confirmed

cancellation in writing on November 22, 2010.  (Id. ¶ 102.4.)   Still, Global billed them not only

"for the remainder of November, but for the entire month of  December, and for the entire month

of January" – although January's payment was eventually reversed by the bank.  (Id.)  These

Plaintiffs construe the allegedly unauthorized post-cancellation payments as "an illegal and

unenforceable penalty."  (Id. ¶ 102.11.)

### 3.      Plaintiffs Baker and Green

On March 30, 2010,[1] Tanya Baker and Danette Green enrolled as members of Global's

fitness club "pursuant to a 12-month contract, with monthly installment payments of $24.95

("the Baker/Green Contracts").  (Mot., Exs. 2, 3; Compl. ¶¶ 91, 97.)  At the time they signed

their Contracts, an Urban Active employee "informed [them] there were no [ ] fees other than the

_____

[1]Although these Plaintiffs allege that they became members of Global on April 30, 2010, the executed copies of their contracts show that they actually became members on March 30, 2010.  (See Mot., Exs. 2, 3.)

monthly $24.95 charge." (Compl. ¶¶ 92, 98.)   Like Robins, Zadiraka and Odelli, Plaintiffs

Baker and Green allege that when they signed their contracts, they were "not fully advised of the

cost of membership including, but not limited to, [the] annual maintenance fee." (Id. ¶¶ 93, 99.)

At some point during the period of their 12-month membership, Global unilaterally increased

their monthly membership charge by $1, and improperly charged their accounts $25.95 per

month (instead of $24.95 per month), and a $15 maintenance fee that was not part of the agreed

upon monthly rate, without their authorization. (Id. ¶¶ 94-95, 100-01.)

### 4.        Plaintiff Bruch

Maria Christina Bruch entered into a Personal Training Contract with Global on March

29, 2011. (Mot., Ex. 6.)  Bruch asserts that she only agreed to sign up for two months of

personal training services, and was reassured that her membership would only last until the

middle of June 2011. (Compl. ¶ 77.)  Bruch claims that she was told that she would only have to

pay $200/month for personal training services. (Id. ¶ 78.)  Bruch provided her credit card

information only to complete the formalities of the enrollment process, and was told that her

credit card would not otherwise be used for financial transactions. (Id. ¶ 79.)  Bruch asserts that

she signed her contract electronically, and that Global did not provide her with a copy of her

contract or notice of cancellation form. (Id. ¶¶ 75-76.)

On April 11, 2011, Bruch discovered that Global charged $473.02 to her credit card

account. (Compl. ¶ 80.)  When she disputed the charges, she was told that the additional charges

were for fees, taxes and a $200 deposit for the last month's dues – which deposit would be

refunded at the end of the program. (Id. ¶ 81.)

On April 25, 2011, Bruch informed Global that she would make the last payment by personal check.  (Id. ¶ 82.)  Global accepted her check for $215 and presumably credited her account for that amount.  (Id.)  Bruch also requested that her contract be formally cancelled and requested a copy of the contract.  (Id. ¶ 83.)  According to Bruch, this is the first time she saw the entire contract, which indicated that she had signed up for 48 sessions for 12 months instead of the 2 months she originally requested.  (Id. ¶ 83.)  Bruch claims that an Urban Active employee told her that she could not change the contract because Global did not allow personal training contracts for less than a year, and encouraged her to check the box for "Cancel Due to Move" on her cancellation form so that she could presumably get a prorated refund, which Bruch did.  Global later informed Bruch that she would have to pay $393.20 to cancel her membership unless she could prove that she was cancelling due to a move.  (Id. ¶ 86.)  Like the other Plaintiffs, Bruch states that she was given false information about the cost of membership and maintenance fees, and that her account was charged unauthorized fees.  (Id. ¶¶ 87-89.)  In addition, she was denied a prorated refund presumably for her "relocation" cancellation.  (Id.)

**B.**     **CONTRACT TERMS**

On the first page of the Membership Contracts, each Plaintiff acknowledged receiving a copy of the respective Contract and admitted reading and understanding the Contract:

> I ACKNOWLEDGE RECEIPT OF A COPY OF THIS AGREEMENT AND I ACKNOWLEDGE THAT I HAVE BEEN ORALLY ADVISED OF MY RIGHT TO CANCEL THIS [AGREEMENT].  I HAVE READ AND UNDERSTAND THE CONTRACT.

(Mot., Exs. 1-6, at 1.)  Immediately above the members' signature line, the Contracts state:

> NOTICE TO BUYER.  DO NOT SIGN THIS CONTRACT UNTIL YOU HAVE READ ALL OF IT.  ALSO DO NOT SIGN THIS CONTRACT IF IT

-6-

CONTAINS ANY BLANK SPACES.

(Id.)  Members are advised that the Contracts "INCLUDE[ ] ADDITIONAL TERMS AND CONDITIONS ON PAGE 2."  (Id.)  All but the Personal Training Contracts state that "NO ORAL REPRESENTATIONS, STATEMENTS, OR INDUCEMENT APART FROM THE AGREEMENT HAVE BEEN MADE."  (Id.)

> **1.      Cancellation Policy**

The Contracts provide for cancellation under several circumstances.  First, a member may cancel the contract for any reason at any time prior to midnight of the third business day (or in some instances the seventh business day) following the day the Contract was executed, provided the member delivers to Global in person or by certified mail a signed and dated cancellation form – in which case the member is entitled to a full refund.  (See Mot., Exs. 1-6, at 1.)

The Contracts also provide for a prorated refund in the event of cancellation due to death, disability, or relocation:

> If by reason of death or disability, the Buyer is unable to receive benefits from the Seller's services, the contract shall be cancelled and proportionally divided by all the days in which the facility was made available to the Buyer as part of the contract offering, and the Buyer shall be liable for payments only for that portion of the contract that can be attributed to the period prior to the Buyer's actual death or disability, exclusive of any period of time in which the facility was made available to the Buyer free of charge as part of the contract offering, and the Seller, within thirty days after receiving notice of the death or disability, shall return to the Buyer or his representative the amount paid in excess of the proportional amount.

> If the Buyer relocates twenty-five miles or more from the facility operated by the Seller or a substantially similar facility that would accept the Seller's obligation under the contract and if the Buyer gives the Seller written notice that he intends to relocate and requests that the contract be terminated, the contract shall be cancelled and proportionally divided by all the days in which the facility was

made available to the Buyer as part of the contract offering, and the Buyer shall be liable for payments for only the portion of the contract that can be attributed to the period prior to the Buyer's actual relocation, exclusive of any period of time in which the facility was made available to the Buyer free of charge as part of the contract offering, provided, that the Seller may require and verify reasonable evidence of relocation, and the Seller shall return to the Buyer the amount paid in excess of the proportional amount.

(See id., "Consumer's Right to Cancellation" (emphasis added).)

The Contracts contain a general cancellation provision for terminating monthly membership payments:

A cancellation notice delivered or postmarked a minimum of 30 days prior to your next Billing Date will result in no further billing of dues if you paid your last month's dues in advance.  If your last month's dues were not paid in advance, you will be billed one more cycle.  A cancellation notice delivered or postmarked less than 30 days prior to your next Billing Date will result in one more monthly billing, if you paid your last month's due[s] in advance.  If your last month's dues were not paid in advance, you will be billed two more cycles.

(Id. (emphasis added).)

Finally, with regard to the cancellation of personal training sessions or services, the Contracts provide:

42.    EARLY TERMINATION OPTION:  To the extent not limited or prohibited by applicable law, you may cancel this Agreement at any time, provided your account is in good status, by providing written notice of cancellation to [Global's] address, as provided in Consumer's Right to Cancellation, and paying a termination fee in the amount of $250.00 or 15% of the Total Contract Price, whichever is greater.  Upon exercising this early termination option, the Buyer forfeits any paid but unused sessions.  To allow for processing, you are advised to submit written notice of cancellation and full payment of termination fee at least 30 days prior to your next scheduled monthly payment due date as noted on page 1 of this agreement.

(Mot., Ex. 6 ¶ 42.)  However, no refunds are made for unused sessions or services purchased unless the cancellation is due to death, disability or relocation, in which case the pro rata refund

-8-

provision applies.  (Id. ¶ 48.)

## 2.    Additional Fees

The Membership Contracts expressly provide for a semi-annual $15 facility improvement fee, and both the Membership Contracts and the Personal Training Contract provide for a cancellation administrative fee of $10.00:

> 47.    FACILITY IMPROVEMENT FEE:  In addition to the payment provisions required in accordance with Page 1, Buyer agrees to pay a semi-annual $15.00 (fifteen) facility improvement (FI) fee each year as a term and condition of their membership in addition to the membership fees agreed in this contract.  The proceeds from this fee will be applied to new equipment purchases, facility upgrades, and operating expenses of the facility.  Buyer agrees to make semiannual payments by the billing method listed in the Buyer Info section on Page 1 of this agreement which will be either by credit card or electronic funds transfer (EFT) in conjunction with their normal January and July billing dates or on the 1st day of January and the 1st day of July if a paid-in-full contract.

(Mot., Exs. 1-6 ¶ 47.)

> 45.    CANCELLATION ADMINISTRATIVE FEE:  The Club reserves the right to charge a member a $10.00 administrative fee in connection with the termination of this agreement.

(Id., Ex. 6 ¶ 45.)

## III.    STANDARD OF REVIEW

Global's 12(b)(6) Motion to Dismiss for failure to state a claim seeks dismissal of all claims.  A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  "The first step in testing the sufficiency of the complaint is to identify any conclusory allegations."  *Doe v. Simpson*, No. C-1-08-255, 2009 WL 2591682, at *1 (S.D. Ohio Aug. 19, 2009) (citing *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009)).  550 U.S. 544, 555 (2009)).  "Threadbare recital of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 120 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "Although the court must accept well-pleaded factual allegations of the complaint as true for purposes of a motion to dismiss, the court is 'not bound to accept as true a legal conclusion couched as a factual allegation.' " *Simpson*, 2009 WL 2591682, at *1 (quoting *Twombly*, 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 550).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  More is required than "unadorned, the-defendant-unlawfully-harmed me accusations." *Id*.

## IV.   ANALYSIS

### A.   Count One – Breach of Contract

Global contends that the Contracts and the cancellation form foreclose the breach of contract claims as a matter of law.  (Mot. at 8.)  In support of this position, Global has attached to its Motion copies of the executed Membership Contracts, Bruch's Personal Training Contract, and Robins' cancellation form.  (Id., Exs. 1-7.)

As a preliminary matter, Plaintiffs argue that the Court cannot consider Global's exhibits without converting the Motion to Dismiss into a motion for summary judgment.  (Opp'n Br. at 5.)  In any event, the Court cannot consider the exhibits because they are not authenticated.  (Id.)  Should the Court determine that Global's exhibits are permissible, Plaintiffs ask that they be

granted leave to conduct discovery so that they may respond in kind with documentary and testimonial evidence.  (Id.)

Global counters that the exhibits may be properly considered by the Court without converting the Motion into one for summary judgment and allowing discovery because the exhibits are referenced in the Complaint and are central to Plaintiffs' claims.  (Mot. at 8.)  The Court agrees.

Ordinarily, a Rule 12(b)(6) analysis precludes the Court from considering documents outside the pleadings.  *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), abrogated on other grounds, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989).  However, the Court may consider documents a defendant attaches to a motion to dismiss if those documents are referred to in the complaint and central to a plaintiff's claims.  *Weiner*, 108 F.3d at 89.  "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied."  *Id*. (citation omitted).

As well, Global's lack of authentication of the Contracts does not preclude the Court's consideration of them where, as here, Plaintiffs do not question the substantive validity, accuracy, or completeness of the documents.  *Borders v. Chase Home Fin. L.L.C.*, 2009 U.S. Dist. LEXIS 54871, at *13-15 (E.D. La. June 26, 2009); *see also Berry v. Indianapolis Life Ins. Co.*, 600 F. Supp. 2d 805, 812 (N.D. Tex. 2009).[2]

---

[2]The Court also deems Plaintiffs' failure to address these clearly established tenets in their Surreply their concession to Global's position on this issue.

Because the executed contracts are repeatedly referenced in the complaint and are central to, and determinative of, the claims, and because Plaintiffs do not question the validity, accuracy or completeness of the contracts, the Court shall consider them without converting the motion into one for summary judgment or allowing discovery.

                    *      *      *

To establish a prima facie breach of contract claim, a plaintiff must show (1) the existence of a contract; (2) plaintiff's performance under the contract; (3) defendant's failure to perform under the contract; and (4) damages resulting from defendant's failure to perform.  *See Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006); *MMK Grp*., *LLC v. SheShells Co.*, 591 F.Supp. 2d 944, 963 (N.D. Ohio, 2008).  To survive a motion to dismiss a plaintiff need not describe all the details of the alleged breach, but must plead sufficient facts to show that he is entitled to relief.  *See generally Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  While the Court must construe the Complaint in a light most favorable to the Plaintiffs, the claim must be supported by factual allegations such that it is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### 1.  Robins

Only Plaintiff Robins asserts that he cancelled his membership due to a disability and that Global breached the contract by failing to provide the agreed prorated refund.  However, the Cancellation Form signed by Robins on October 19, 2010 shows that he checked the general cancellation box rather than the Medical Cancel box as the reason for cancelling his membership.  (Mot., Ex. 7, at 2.)  The medical cancellation box required Robins to attach proof from a medical doctor showing that he was cancelling his membership for medical reasons.  (Id.)

-12-

In signing the form, Robins certified that:

> I HAVE READ MY AGREEMENT AND THE URBAN ACTIVE MEMBER
> CANCELLATION FORM.  I UNDERSTAND AND AGREE TO THE TERMS
> LISTED ON THIS FORM.

(Id.)

Robins argues that his Contract did not require him to advise Global of his disability in any particular manner (i.e., by checking the "medical cancel" box on the Cancellation Form or providing proof of disability from a doctor).  Robins casually asserts that he "informed Global of his disability, cancelled his membership, and requested a prorated refund."   (Opp'n Br. at 11.)

These assertions lack merit in the face of undisputed documentary evidence showing that Robins formally requested not a medical, but a general, cancellation of his membership, certified that he read and understood the Cancellation Form, and certified that he understood and agreed to the terms listed on the Cancellation Form.  Although Robins asserts that he "informed" Global of his disability, he does not allege that he notified Global in writing of his disability, provided medical verification thereof, and Global, nevertheless, refused to give him a prorated disability refund.  Accordingly, the Court dismisses Robins' breach of contract claim with prejudice.

### 2.    Zadiraka and Odelli

Zadiraka and Odelli allege that Global breached their contracts by continuing to charge monthly fees to their bank accounts following cancellation.

A review of their Membership Contracts shows that, although their membership start dates were November 1, 2009, their billing start dates were December 1, 2009.  (See Doc #: 12-5 at 2; Doc #: 12-6 at 2.)  This means they were charged, and paid, their monthly dues retrospectively.  Pursuant to the general cancellation provision of their contracts, "[a]

-13-

cancellation notice delivered or postmarked less than 30 days prior to your next Billing Date will result in one more monthly billing, if you paid your last month's due[s] in advance.  If your last month's dues were not paid in advance, you will be billed two more cycles."  (Id.)  Since these Plaintiffs delivered their written cancellation notices less than 30 days prior to their next billing date (i.e., December 1, 2010) and they did not pay their last month's dues in advance, they were properly billed, per their contracts, for two more billing cycles (i.e., December 2010 and January 2011).  In any event, they can show no injury because the January 2011 charges were reversed by their banks.

These Plaintiffs also allege that the general cancellation provision of their contracts, calling for payment of two more billing cycles in certain cases, is "an illegal, unenforceable penalty" constituting a breach of contract.  In support, Plaintiffs cite two Ohio state court cases holding that stipulated contractual damages which are intended to punish rather than compensate for services rendered are an unenforceable penalty.  (Opp'n Br. at 9 (citing *Groedel v. Arsham*, 2007-Ohio-1715 (Ohio App. 8 Dist. 2007) and *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376 (1993).)  Those cases are inapplicable here, where the Membership Contracts expressly permitted Global to charges these fees to their accounts, and Plaintiffs have cited no Ohio or Kentucky case law holding that thirty-day cancellation provisions constitute an illegal or unenforceable penalty resulting in a breach of contract.  Accordingly, their breach of contract claims are also dismissed with prejudice.

### 3.      Baker and Green

These Plaintiffs allege that Global breached their Membership Contracts by overcharging their bank accounts $1 more per month than their contracts permitted.  What they fail to allege is

-14-

whether they ever advised Global of this minimal alleged overcharge and, if so, whether Global refused to refund their accounts.  Given the *de minimis* nature of this claim, it is just as plausible that Global made a billing error.  The breach of contract claim is, therefore, dismissed without prejudice.

These Plaintiffs also complain that Global breached their contracts by charging their accounts a $15 semi-annual maintenance fee.  It is undisputed, however, that their executed contracts not only obligate them to pay a semi-annual $15 maintenance fee (Doc #: 12-5 ¶ 47; Doc #: 12-6 ¶ 47), but warn each of them <u>not</u> to sign their contracts "until you have read all of it" (see id. at 1).  Accordingly, this breach of contract allegation is dismissed with prejudice.

### 4.    Bruch

Bruch alleges she only signed up for two months of personal training services, not twelve months.  She asserts that Global breached the Personal Training Contract by giving her false information about the contract terms and fees, particularly the cancellation fee.  She claims that she is not bound by the written contract because Global did not give her a copy of the contract at the time that she electronically signed it.  She complains that Global breached the contract in any event by failing to give her a prorated refund due to her purported relocation.

The problem with Bruch's allegations is that the executed copy of her contract details all the fees, including a fee for early termination, for which she was obligated.  (See Doc #: 12-7.) Her contract is an annual contract for 4 personal training sessions per month for twelve months at a rate of $50/session, adding up (with taxes) to a recurring monthly payment of $215.50.  (Id. at 2.)  Along with a processing fee of $39 plus tax, the Total Contract Price is $2,628.02.  (Id.) The Terms of Membership and Renewal Provisions, which Bruch initialled, states:

Membership under this Agreement is for the number of months listed above.  This Agreement shall automatically renew, excluding Paid in Full memberships, after the end of the last month set forth above on a month-to-month membership basis and Buyer will pay for that month to month membership the current monthly rate the Seller is charging for that type of membership.  During the term of the month-to-month Membership, the number of monthly training sessions that Buyer is entitled to receive shall equal the number of training sessions per month Buyer was entitled to receive during the Initial Membership term.  This month-to-month membership may then be cancelled with a 30-day written notice to Seller by certified mail, return receipt request or on the cancellation form provided at the Club location with said cancellation to become effective on the 1st of the next month following the expiration of the 30-day written notice with no proration, provided your account is not delinquent.

(Id.)  In addition to the three-day cancellation period with a full refund, and the prorated refund for cancellation due to death, disability or relocation, Bruch's contract contains an Early Termination Option located on the second page, which page she initialled.  (Doc #: 12-7, at 3.) This Option provides:

To the extent not limited or prohibited by applicable law, you may cancel this Agreement at any time, provided your account is in good status, by providing a written notice of cancellation to the Seller's address, as provided in Consumer's Right to Cancellation, and paying a termination fee in the amount of $250 or 15% of the Total Contract Price, whichever is greater.

(Id.)  Bruch signed the contract in two places: (1) immediately below the warning: NOTICE TO BUYER: DO NOT SIGN THIS CONTRACT UNTIL YOU HAVE READ ALL OF IT.  ALSO, DO NOT SIGN THIS CONTRACT IF IT CONTAINS ANY BLANK SPACES," and (2) in the space authorizing her bank/credit card company to make the $215.50 recurring monthly payments.  (Id. at 2.)  Finally, Bruch's contract states:

I ACKNOWLEDGE RECEIPT OF A COPY OF THIS AGREEMENT AND I ACKNOWLEDGE THAT I HAVE BEEN ORALLY ADVISED OF MY RIGHT TO CANCEL THIS TRANSACTION I[N] ACCORDANCE WITH THE ATTACHED NOTICE OF CANCELLATION I HAVE READ AND UNDERSTAND THIS AGREEMENT.

-16-

(Doc #: 12-7, at 1.)

Bruch cannot assert a breach of contract claim against Global for failing to give her a prorated refund for cancelling her contract due to relocation because she admits that she did not move. She also cannot assert a breach of contract claim against Global for charging her $393.20 for early termination because that was the amount provided under the Early Termination Option.

Bruch asserts that Global misrepresented the terms of the contract to her when she signed it, and claims she is not bound by the contract because she did not receive a copy of her contract when she signed it electronically. However, she specifically acknowledged having read the entire contract, having received a copy of it, and having been orally advised of her right to cancel the contract in accordance with the attached notice of cancellation. She signed the provision authorizing recurring monthly payments from her bank/credit card account, she initialled the provision specifically discussing the terms of her annual contract; and she initialled the page which informed her of the early termination option. Under the circumstances, she may not rely on oral representations to vary the unambiguous terms of a written contract. *See, e.g., Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., LPA*, Nos. 2:04-cv-494, 2:04-cv-584, 2007 WL 2572258, at *7 (S.D. Ohio Sep. 4, 2007) (in interpreting the intent of parties to a contract, a court will only resort to extrinsic evidence where the contract language is unclear or ambiguous). Thus, her contract claim is dismissed with prejudice.

### B.    Count Two – Unjust Enrichment

Plaintiffs assert that Global was unjustly enriched when it continued to charge their accounts after they cancelled due to disability or death. Specifically, Global charged Plaintiffs

"at least one extra month's charges" after Plaintiffs asked Global to cancel their memberships. (Compl. ¶¶ 144-47.)

"[U]njust enrichment operates in the absence of an express contract . . . to prevent a party from retaining money or benefits that in justice and equity belong to another." *Kwikcolor Sand v. Fairmount Minerals Ltd*., Cuyahoga App. No. 96717, 2011-Ohio-6646 ¶ 14 (citation omitted). "Absent bad faith, fraud, or some other illegality, an equitable action for unjust enrichment cannot exist where there is a valid and enforceable written contract." *Id*. (citation omitted). Both Ohio and Kentucky bar recovery under the theory of unjust enrichment when a express valid contract exists and covers the same subject. *DavCo Acquisition Holding, Inc. v. Wendy's Int'l, Inc.*, No. 2:07-CV-1064, 2008 WL 755283, at *12 (S.D. Ohio Mar. 19, 2008) (citing *Ullman v. May*, 147 Ohio St. 468 (1947)); *Ham Broad. Co. v. Cumulus Media, Inc.*, No. 5:10-CV-00815-R, 2011 WL 1838911, at *6 (W.D. Ky. May 13, 2011) (citing *Codell Constr. Co. v. Kentucky*, 566 S.W.2d 161, 165 (Ky.Ct.App.1977) ("the doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed.").

Only Plaintiff Robins alleges that he cancelled his membership due to disability.  He cannot bring an unjust enrichment claim against Global, however, because there is a valid contract that covers his cancellation, he failed to check the appropriate cancellation box or provide proof that he was disabled, and he was charged the general cancellation fees consistent with his contract and cancellation form.  Additionally, no plaintiff alleges that Global continued charging the account of a member who died after having received notice.  Finally, because the terms and conditions of all Plaintiffs are covered by the written contracts, the unjust enrichment claim is dismissed with prejudice.

-18-

C.     **Count Three – Fraud**

Plaintiffs allege that Global representatives made false oral representations to them regarding the terms and conditions of their written contracts, or failed to disclose material terms and conditions of their contracts constituting fraudulent inducement to contract.  (See generally Compl. ¶¶ 20, 21, 151-56.)

In Ohio, the elements of a fraudulent inducement claim are "(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance."  *Simon Property Group, LP v. Kill*, 2010-Ohio-1492 ¶ 17 (Ohio App. 3 Dist. Apr. 5, 2010).  "A classic claim of fraudulent inducement asserts that a misrepresentation of facts outside the contract . . .  induced a party to enter into the contract."  *Paragon Networks, Intern. v. Macola, Inc.*, No. 9-99-2, 1999 WL 280385, at *4 (Ohio App. 3 Dist. 1999) (quoting *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503 (1998)).  However, parties may not prove fraud by claiming that the inducement to enter into the contract was a promise that was within the scope of the integrated agreement but was ultimately not included within it.  *Id.* (citing *Busler v. D & H Mfg., Inc.*, 81 Ohio App.3d 385, 390 (Ohio App. 10 Dist. 1992) and *Wall v. Firelands Radiology, Inc.*, 106 Ohio App.3d 313, 324 (1995)).  *Cf. Tinnes v. Immobilaire IV, Ltd.*, No. 00AP-87, 2001 WL 122073 (Ohio App.10 Dist. Feb. 13, 2001) (affirming trial court's ruling that the parol evidence rule barred appellants from raising fraud as a defense to enforcement of promissory notes where the notes contained integration clauses); *Woods v.*

-19-

*Cobbins*, 2004 WL 2429801, 2004-Ohio-5767, ¶ 20 (Ohio App. 2 Dist. 2004) (a party may not

evade the parol evidence rule by claiming that the fraudulent inducement was a prior oral

agreement the terms of which contradict the written agreement).

In order to establish a claim for fraud under Kentucky law, a plaintiff must prove (1) a

material misrepresentation, (2) which is false, (3) which was known to be false, or made

recklessly, (4) made with inducement to be acted upon, (5) which is acted upon in reliance

thereon, and (6) causes injury.  *Helton v. American Gen. Life Ins. Co*., No. 4:09-CV-118-M,

2010 WL 2889666, at *2 (W.D. Ky. Jul. 21, 2010) (citing *Moore, Owen, Thomas & Co. v.*

*Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993)).  Reliance must be reasonable.  *Id.* (citation

omitted).  While integration clauses in Kentucky do not *per se* bar fraud claims, a party may not

rely on oral representations that expressly contradict the unambiguous terms of a written

contract.  *Id.* (citations omitted).

In short, in both Ohio and Kentucky, a party is foreclosed from bringing a fraudulent

inducement claim if the contracting parties integrated their negotiations and promises into an

final, unambiguous written agreement.

The problem with Plaintiffs' fraud claim is that all their contracts warn Plaintiffs <u>not</u> to

sign them  until they have read them.  The contracts of all Plaintiffs but Bruch contain

integration clauses: "Member agrees that no warranties, statements or inducements apart from

the agreement have been made."  (Doc ##: 12-2 to 12-6, at 1.)  Bruch's contract states: "I

acknowledge receipt of a copy of this agreement and I acknowledge that I have been orally

advised of my right to cancel this transaction in accordance with the attached notice of

cancellation.  I have read and understand this agreement."  (Doc #: 12-7, at 1.)  As has been

-20-

shown above, none of the Plaintiffs allege that Global charged any fees that were inconsistent with the unambiguous terms of their written contracts. Accordingly, the Court dismisses the fraud claim with prejudice.

### C. Count Four: Ohio's Consumer Sales Practice Act Claim
### Count Five: Ohio's Prepaid Entertainment Contracts Act Claim

Plaintiffs allege that Global violated the Ohio Consumer Sales Practice Act ("OCSPA") and the Ohio Prepaid Entertainment Contract Act ("OPECA") by improperly collecting and retaining money paid for periods subsequent to death, disability or relocation of its member; by knowingly misrepresenting the terms and conditions of its membership and personal training contracts, and by continuing to deduct amounts that are not provided in their contracts. Plaintiffs further allege that Global's conduct has been previously found to be unfair and deceptive by Ohio courts. The OCSPA contains provisions specifically covering so-called prepaid entertainment contracts. O.R.C. ¶¶ 1345.41 to 1345.50.

The OCSPA prohibits suppliers from committing unfair, deceptive, or unconscionable consumer sales practices as set forth in Ohio Rev. Code §§ 1345.02 and 1345.03. The OPECA sets forth additional standards applicable to prepaid contracts for services in a variety of industries, including health spas. Ohio Rev. Code § 1345.41. Under OPECA, violations of the additional standards set forth in Ohio Rev. Code § 1345.41 constitutes a deceptive sales practice under Ohio Rev. Code § 1345.02 of the OCPSA, which allows individuals to seek relief under the CPSA's private remedy statute, Ohio Rev. Code § 1345.09. O.R.C. § 1345.48.

A consumer may qualify for class-action certification under the OCSPA only if the defendant's alleged violation is substantially similar to an act or practice previously declared to be deceptive or unconscionable. *Marrone v. Philip Morris U.S.A., Inc.*, 110 Ohio St.3d 5, 8

(2006) (citing O.R.C. § 1345.09(B).  The prior notice may be in the form of (1) a rule adopted by the Attorney General under O.R.C. § 1345.09(B), or (2) an Ohio court decision published by the Attorney General.  *Id.*  Importantly, the Ohio Supreme Court has held, "Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA."  *Id*. at 9.

Global contends that Plaintiffs' OCSPA and OPECA class claims are precluded as a matter of law because Plaintiffs' have failed to cite any rule promulgated by the Attorney General or Ohio court decision that would satisfy the statutory prior notice requirements.  The Court agrees.

None of the following cases cited by Plaintiffs involve conduct from the heath spa or fitness industry or conduct relating to heath spa or fitness contracts.  *Warren v. Denes Concrete, Inc.*, 2009 WL 1655038, at ¶ 11 (Ohio Ct. App. June 15, 2009) (finding that a concrete contractors' failure to put all material terms of the contract in writing did not constitute and unfair or deceptive act under the OCSPA); *Teeters Constr. v. Dort*, 142 Ohio Misc. 2d 1 (Ohio Mun. Ct. 2006) (finding that a construction company violated the OCSPA by misrepresenting warranty terms); *Harrell v. Talley*, 2007 Ohio 3784 (Ohio Ct. App., July 23, 2007) (finding that automobile seller violated the OCSPA by misrepresenting the vehicle's quality and price); *Lump v. Best Door & Window, Inc.*, 2002 Ohio 1389 (Ohio Ct. App., Mar. 27, 2002) (finding that a genuine issue of material fact existed as to whether a window company's delay in delivering windows to customers constituted a violation of the OCSPA).

Plaintiffs argue that Global "was aware that its practices of fraudulently inducing customers into signing membership agreements <u>could</u> constitute a violation of the CSPA, as it

-22-

had previously been sued for the same conduct." (Opp'n Br. at 13 (citing *Perkins v. Global Fitness Holdings, Inc*., No. 1:07-CV-3, 2007 WL 2902936 (S.D. Ohio Oct. 2, 2007) (emphasis added).) The operative word is "could" because the *Perkins* case settled before there was any analysis of the merits of the plaintiffs' OCSPA claim. In any event, the fact that *Perkins* is the decision of a federal court sitting in Ohio is insufficient to qualify as an Ohio court decision providing prior notice under the OCSPA. *See Kline v. Mortgage Elec. Sec. Sys*., No. 3:08cv408, 2010 WL 6298271, at *5-6 (S.D. Ohio Dec. 30, 2010) (numerous citations omitted). Plaintiffs' reliance on *State of Ohio ex rel. Montgomery v. USA Cable Co.* (Feb. 26, 2002), Huron County Case No. CVH-2001-466, is also misplaced because that case did not involve the fitness industry, and it resulted in a consent judgment. *Kline,* 2010 WL 6298271 (S.D. Ohio Dec. 30, 2010) (consent judgments with no analysis of the merits are insufficient prior notice of deceptive or unconscionable acts under O.R.C. § 1345.09(B)).

More importantly, Plaintiffs have failed to allege individual claims against Global under the Acts because Global's conduct in charging post-cancellation and other fees was consistent with the executed contracts, and any oral representations to the contrary were precluded by the integration clauses in those contracts. Furthermore, the contracts contained, nearly verbatim, the statutory language for three-day cancellations and cancellations due to death, disability and relocation – the only cancellation provisions required under the OPECA. Accordingly, Counts Four and Five are dismissed with prejudice.

> **D.     Count Six:     Ohio's Deceptive Trade Practices Act Claim**

The Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.01, *et seq.* ("DTPA"), is "substantially similar to the federal Lanham Act, and it generally regulates trademarks, unfair

competition, and false advertising." *Dawson v. Blockbuster, Inc.*, 2006-Ohio-1240, at ¶ 23 (Ohio App. 8 Dist. Mar. 16, 2006) When adjudicating claims pursuant to the DTPA, "Ohio courts shall apply the same analysis applicable to claims commenced under analogous federal law." *Id.* (quoting *Chandler & Assocs. v. America's Healthcare Alliance*, 125 Ohio App.3d 572, 579 (Ohio App. 8 Dist. Dec. 11, 1997)).

In *Dawson*, the court noted that "[a]t least half of the circuits hold (and none of the others disagree) that § 45 of the Lanham Act, 15 U.S.C.S § 1051 *et seq*., specifically 15 U.S.C.S. § 1127, bars a consumer from suing under the act." *Id.* ¶ 24. Under the Lanham Act, consumers lack standing because the purpose of the Act "is exclusively to protect the interest of a purely commercial class against unscrupulous commercial conduct." *Id.* (citing *Made in the USA Found. v. Phillips Foods, Inc.*, 365 F.3d 278 (4th Cir. 2004)).

There is a conflict between the courts in the Northern and Southern Districts of Ohio on the question of whether a consumer lacks standing to file suit under the DTPA. *See McKinney v. Bayer Corp.*, 744 F.Supp.2d 733, 749 (N.D. Ohio 2010).[3] Plaintiffs cite *Bower v. Int'l Business Machines, Inc.*, 495 F. Supp. 2d 837 (S.D. Ohio 2004) to support the argument that they have standing because the DTPA's statutory definition of a person includes "an *individual*, corporation, government, governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, limited liability company, two or more of any of the foregoing having a joint common interest, *or any other legal or commercial entity*." O.R.C. § 4165.01(D) (emphasis added). Global cites several cases to support its position that consumers

---

[3]In *McKinney*, the court explained the conflict between *Bower* and *Dawson* in great detail. The court determined that the issue of whether an individual has standing under the DTPA should be certified to the Ohio Supreme Court. However, the issue was never certified as the plaintiff dismissed the DTPA claim.

-24-

lack standing under the DTPA because the statute only governs conduct between commercial entities.  *Dawson*; *Blakenship v. CFMOTO Powersports, Inc.*, 2011-Ohio-948 (Ohio Com.Pl. 2011); *Glassner v. R.J. Reynolds Tobacco Co.*, No. 5:99 cv 796, 1999 WL 33591006, *6 (N.D. Ohio Jun. 29, 1999); *Chamberlain v. Am. Tobacco Co.*, No. 1:96 cv 2005, 1999 WL 33994451, at *18 (N.D. Ohio Nov. 19, 1999).

 The *Bower* court examined the statutory language and determined that it does not place limitations on what type of individual can be considered a 'person' and consumers may pursue a claim under the DTPA.  *Bower*, 495 F. Supp .2d 837 at 843-44.  The statute includes a long list of entities that can pursue a claim under the DTPA and individuals are included in that list.  The *Bower* court disagreed with the *Chamberlain* court which interpreted the phrase "or any other legal or commercial entity" as placing a limitation on the types of entities included in the list. *See Chamberlain,* 1999 WL 33994451, at *18 (citing O.R.C. § 4165.01(D)).

 The Court disagrees with *Bower* and adopts the *Dawson/Chamberlain* interpretation of the DTPA.  The *Bower* opinion fails to note that Ohio courts look to the Lanham Act when adjudicating claims under the DTPA.  *See Bower,* 495 F.Supp.2d at 843-44.  It is well-established law that a consumer lacks standing to pursue a cause of action for false advertising under the Lanham Act because "the stated purpose of the Act is to protect persons engaged in commerce, not individual consumers, against unfair competition."  *Blankenship*, 2011-Ohio-948, at ¶ 27.  It should also be noted that to confer standing on consumers under the DTPA would render the CSPA superfluous as both statutes regulate the same type of conduct.  *See McKinney*, 744 F.Supp.2d at 752.  For these reasons, the Court dismisses the DTPA claim with prejudice.

E.    **Count Seven: Kentucky Consumer Protection Health Spa Act**

Kentucky Plaintiffs Baker and Green allege that Global violated the Kentucky Consumer Protection Health Spa Act, KRS § 367.900 *et seq*., by not properly describing the buyer's statutory right to cancel, imposing requirements for cancellation that violate the statute, and failing to conform to the requirements of KRS § 367.910.  (Compl. ¶ 183.)

Under KRS § 367.910, a health spa like Global must deliver a fully completed copy of the membership contract to the new member at the time the contract is signed.  KRS § 367.910(a).  Every such contract must constitute the entire agreement between the parties, must be in writing and must signed by the member.  (Id.)

Each contract shall state in at least ten (10) point bold faced type the following:

NOTICE TO BUYER:  DO NOT SIGN THIS CONTRACT UNTIL YOU HAVE READ ALL OF IT.  ALSO, DO NOT SIGN THIS CONTRACT IF IT CONTAINS ANY BLANK SPACES.

KRS § 367.910(2).

Every purchaser of a membership shall be entitled to cancel his or her contract within three business days by notifying the health spa in writing of the third business day following the date of purchase of the contract, at which time the new member is entitled to a full refund.  KRS § 367.910(3).  In addition, the contract must contain the following notice in at least ten (10) point bold faced type:

IF WITHIN THREE (3) DAYS YOU DECIDE YOU DO NOT WISH TO REMAIN A MEMBER OF THIS HEALTH SPA, YOU MAY CANCEL THIS AGREEMENT BY MAILING A NOTICE TO THE HEALTH SPA BY MIDNIGHT OF THE THIRD BUSINESS DAY FOLLOWING YOUR PURCHASE OF THE CONTRACT STATING YOUR DESIRE TO CANCEL THIS CONTRACT.  THE WRITTEN NOTICE SHOULD BE MAILED TO THE FOLLOWING ADDRESS:

-26-

(address of the health spa)

ADDITIONAL CANCEL RIGHTS:

KRS § 367.910(7).  At this point, the contract must also advise the member of the right to cancel membership due to death, medical disability or relocation, in which case the member is entitled to a prorated refund upon verification.  KRS § 367.910(4).

A review of these Plaintiffs' contracts shows that they comply with the statutory provisions and contain, verbatim, the quoted statutory language.  (See Mot., Exs. 2, 3.)  The Plaintiffs allege they were informed by an Urban Active employee that there were no fees other than the monthly maintenance charge, and complained of being charged a semi-annual maintenance fee of $15.  However, their contracts required them <u>not</u> to sign the contracts until they read all of it, their contracts expressly provided for a semi-annual $15 maintenance fee, and there is nothing in the Act that prohibits health spas from charging maintenance or any other fees.  Because these Plaintiffs have not alleged facts showing that these contracts violate the Kentucky statute, Count Seven must be dismissed with prejudice.

>>>
**F.      Count Eight:  Federal RICO Claim**
**         Count Nine:   Ohio RICO Claim**

Plaintiffs allege that Global's practice of continuing to charge monthly membership fees to their bank or credit card accounts after they cancelled their memberships constitutes wire fraud and bank fraud in violation of state and federal law.  Further, Global perpetrated "thousands" of predicate acts of bank and wire fraud through its racketeering association with Plaintiffs' bank and credit card processing vendors, in violation of state and federal Racketeer Influenced and Corrupt Organization Acts, respectively, O.R.C. § 2923.31 *et seq.* and 18 U.S.C.

§ 1961 *et seq* (collectively, "RICO").  Plaintiffs' state RICO claim is premised upon the same conduct as their federal RICO claim .

Ohio's RICO statute, O.R.C. § 2923.31 *et seq*., is patterned after the federal RICO statute.  Thus, courts "have found that the elements for an [Ohio RICO] violation are the same as those for a [federal] RICO claim."  *Foster v. D.B.S. Collection Agency*, 463 F. Supp. 2d 783, 811 (S.D. Ohio 2006) (citing *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28, 32 (Ohio Ct. App. 1993).

To state a RICO claim, a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir.2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)).  An enterprise includes any group of individuals associated together for a common purpose of engaging in a course of unlawful conduct.  18 U.S.C. § 1961(4).  *See also United States v. Trukette*, 452 U.S. 576, 583 (1981).  A plaintiff can demonstrate an "association-in-fact" enterprise, which is alleged in this case, by proving that (1) the associated persons formed an ongoing organization, formal or informal; (2) they functioned as a continuing unit; and (3) the organization was separate from the pattern of racketeering activity in which it engaged. *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000), *abrogated on other grounds, Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639 (2008).  To make a claim under § 1962(c), the plaintiff must plead that the enterprise is the instrument through which illegal activity is conducted.  *Fremont Reorganizing Corp. v. Duke*, – F.Supp.2d –, 2011 WL 4357637, at *7 (E.D. Mich. Sep. 12, 2011.)  A plaintiff must also prove "the underlying claim of wrongful or criminal conduct in order to establish that the defendants were engaged in an enterprise."  *Fremont*, 2011

WL 4357637, at *22 (citing *Vennittilli v. Primerica, Inc.*, 943 F. Supp. 793, 799 (E.D. Mich. 1993)).

The state and federal RICO claims fail in the first instance because Plaintiffs have failed to sufficiently allege underlying fraudulent conduct, let alone the elements of federal bank and wire fraud crimes.  As has been shown, with the exception of the $1 allegedly overcharged to the accounts of Plaintiffs Baker and Green,[4] all EFTs at issue were made pursuant to the parties' unambiguous written contracts.

The RICO claims of all Plaintiffs fail because they have failed to allege an enterprise for the common purpose of committing bank and wire fraud.  Specifically, Plaintiffs allege that the payment processors, who simply charged Plaintiffs' monthly or other fees, were "unwitting accomplices" in Global's goal of unlawfully extracting "enormous illicit profits" from Plaintiffs. (Compl. ¶ 205.)  "The financial institutions [Global] used to process its monthly members' EFT payments reasonably relied on the payment instructions [Global] issued as being accurate representations that [Global] is owed this money and has the authority to collect it."  (Id. ¶ 208.) Further, "[a]cting upon this reliance," the payment processors collect the fees and deposit them in Global's account, and that is how <u>Global</u> commits bank and wire fraud.  (Id. (emphasis added).)  In other words, the payment processors were "unknowingly used by [Global] to effect unauthorized EFT transactions."  (Id. ¶ 210.)

---

[4] As the Court stated above, Plaintiffs Baker and green can not even make out a breach of contract claim for this de minimis alleged overcharge, as they have not alleged that they brought it to Global's attention and Global refused to adjust it.  Given the heightened pleading standard for fraud claims, *Chesbrough v. VPA, PC*, 655 F.3d 461, 466 (6th Cir. 2011), this $1 overcharge cannot serve as a predicate act of fraud.

Plaintiffs rely on *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F.Supp.2d 985 (C.D. Cal. 2008), for the position that they have sufficiently alleged a RICO claim.  *Friedman*, which is nearly factually identical to the instant case, stands for the proposition that plaintiffs need not allege that the payment processors shared a common fraudulent purpose to sufficiently allege an association-in-fact enterprise.

This Court is not bound by the decision of the California district court – which decision has not been cited by any court outside that state for its RICO analysis.  Indeed, the *Friedman* court recognized that the Circuits differed on whether the common purpose element of RICO requires proof that each member shared the common purpose to engage in a particular fraudulent scheme.  *See Friedman*, 580 F.Supp.2d at 991 n.2.

For example, the Second Circuit requires a common fraudulent purpose in order to allege a RICO enterprise.  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2nd Cir. 2004).  There, the court held that, "for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes."  *Id.*, 385 F.3d at 174.  *See also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392 (7th Cir. 2009) (plaintiffs failed to allege a RICO enterprise arising from a business relationship where one entity was merely a conduit for the fraudulent scheme of the other); *Rosner v. Bank of China*, 528 F.Supp.2d 419 (S.D.N.Y. 2007) (rejecting the position that the bank was part of an association-in-fact enterprise by providing ordinary banking services and wire transfers to another entity that perpetrated a fraudulent scheme); *Jubelirer v. Mastercard Int'l*, 68 F.Supp.2d 1049 (W.D. Wisc. 1999) (dismissing a RICO claim

-30-

for failure to allege an enterprise where plaintiff alleged no more than an arms-length contractual business relationship for the provision of ordinary credit card processing services).

Courts in this Circuit have also recognized that routine business relationships, without more, are insufficient to establish a RICO claim.  *VanDenBrock v. CommonPoint Mortg. Co.*, 210 F.3d 696 (6th Cir. 2000) (abrogated on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131) (affirming dismissal of RICO claim because simple business relationship was insufficient to establish a RICO enterprise); *Javitch v. Capwill*, 284 F.Supp.2d 848, 857 (N.D. Ohio 2003) (plaintiff failed to establish the existence of a RICO enterprise where the plaintiff's allegations showed nothing more than a business relationship between the defendants); *Wuliger v. Liberty Bank*, No. 3:02 CV 1378, 2004 WL 3377416 (N.D. Ohio 2004) (the mere provision of banking services in the context of a business relationship, without more, is insufficient to constitute a RICO enterprise).  *Cf. McNew v. People's Bank of Ewing*, 999 F.2d 540 (6th Cir. 1993) (affirming dismissal of RICO claim where the provision of banking services was insufficient to show that the bank engaged in the same indictable offenses the defendant did).

Plaintiffs have made it clear that the payment processors that "tapped" their accounts were merely unwitting accomplices to Global's alleged fraudulent scheme.  Because it is undisputed that the payment processors provided ordinary wire transfers to Global, ignorant of any fraudulent scheme, Plaintiffs cannot establish they were members along with Global of an associated-in-fact enterprise under RICO.  Accordingly, the RICO claims asserted in Counts Eight and Nine are dismissed with prejudice.

-31-

### G.      Count Ten:  Electronic Funds Transfer Act

Plaintiffs contend that Global violated the EFTA by making unauthorized electronic withdrawals of post-cancellation and other fees from their bank or credit card accounts without providing the advance notice required by statute.  (Compl. ¶ 237.)  Global argues that all EFT's were made in accordance with the Terms and Conditions of Plaintiffs' two-page Contracts.

The EFTA provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693(e)(a).  Pursuant to Regulation E, the statute's implementing regulation, "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer." 12 C.F.R. § 205.10(b).

With the exception of the unauthorized $1 added to the monthly withdrawals from the accounts of Plaintiffs Baker and Green, all EFTs were authorized by the parties' unambiguous, written agreements.[5]  Bruch alleges that she never received a copy of her contract until she cancelled her agreement.  However, in her contract, she specifically acknowledged having received a copy of it, having read the entire contract, and having been orally advised of her right to cancel the contract in accordance with the attached notice of cancellation.  She signed the provision authorizing recurring monthly payments from her bank/credit card account, she

---

[5]As stated above, neither Baker nor Green allege that they brought the *de minimis* overcharge to Global's attention, and that Global refused to correct it.

initialled the provision specifically discussing the terms of her annual contract; and she initialled the page which informed her of the early termination option.

For these reasons, the Court dismisses with prejudice the EFTA claim of all Plaintiffs except Baker and Green, whose EFTA claim is dismissed without prejudice.

**III.     CONCLUSION**

Based on the foregoing, the Court **GRANTS** the Motion to Dismiss.  (**Doc #: 12**.)  For reasons stated herein, all claims are dismissed **with prejudice** except for the breach of contract and EFTA claims of Plaintiffs Baker and Green (asserted in Counts One and Ten), which claims are dismissed **without prejudice**.

**IT IS SO ORDERED.**


                                                          _/s/ Dan A. Polster    January 18, 2012_
                                                          **Dan Aaron Polster**
                                                          **United States District Judge**